# District of Columbia
# Court of Appeals

No. 14-AA-935

JEFFREY BOWSER,

<div style="text-align:center">Petitioner,</div>



FILED

DEC 31 2015

DISTRICT OF COLUMBIA
COURT OF APPEALS

<div style="text-align:center">v.</div>    **CRB-4-14**

DISTRICT OF COLUMBIA
DEPARTMENT OF EMPLOYMENT SERVICES,

<div style="text-align:center">Respondent,</div>

and

CLARK CONSTRUCTION, LLC, *et al.*,

<div style="text-align:center">Intervenors.</div>

<div style="text-align:center">

On Petition for Review of an Order
of the District of Columbia Department of Employment Services

BEFORE:  Thompson and Beckwith, Associate Judges; and Reid, Senior Judge.

**J U D G M E N T**
</div>

This case came to be heard on the administrative record, certified copy of the agency hearing transcript, the briefs filed, and was argued by counsel.  On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the portion of the Compensation Review Board's ("CRB") Decision and Order relating to petitioner's claim for medical benefits for treatment of his carpal tunnel and psychological conditions is reversed, and the case is remanded for further proceedings consistent with this opinion.  The CRB's decision upholding the Administrative Law Judge's determination to terminate petitioner's temporary total disability benefits is affirmed.

<div style="margin-left:40%">

For the Court:

*Julio A. Castillo*

JULIO A. CASTILLO
Clerk of the Court
</div>

Dated: December 31, 2015.

Opinion by Associate Judge Phyllis D. Thompson.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-AA-935

JEFFREY BOWSER, PETITIONER,

v.

DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT
SERVICES, RESPONDENT,

and

CLARK CONSTRUCTION, LLC, ET AL., INTERVENORS.

FILED 12/31/15
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

On Petition for Review of Decision and Order
of the District of Columbia Department of Employment Services,
Compensation Review Board
(CRB-4-14)

(Argued September 17, 2015                    Decided December 31, 2015)

*Justin M. Beall* for petitioner.

*Karl A. Racine*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, *Loren L. AliKhan*, Deputy Solicitor General, and *Donna M. Murasky*, Senior Assistant Attorney General, filed a statement in lieu of brief in support of respondent.

*Sarah M. Burton* for intervenors.

Before THOMPSON and BECKWITH, *Associate Judges*, and REID, *Senior Judge*.

THOMPSON, *Associate Judge*: In this matter, petitioner Jeffrey Bowser challenges a Decision and Order of the District of Columbia Department of Employment Services ("DOES") Compensation Review Board (the "CRB") that upheld a Modification Order (the "MO") terminating petitioner's temporary total disability ("TTD") benefits. Petitioner contends that the CRB's Decision and Order must be reversed because (1) the intervenor/employer failed to make a threshold showing of a change in conditions and thus was not entitled to the hearing that led to the MO; (2) the DOES administrative law judge ("ALJ") improperly shifted to petitioner the burden of proving that he was entitled to a continuation of TTD benefits; (3) the intervenor/employer failed to prove that petitioner's condition had changed, with the result that the MO is not supported by substantial evidence; and (4) in any event, a remand is required for DOES to properly consider petitioner's claims for medical benefits for carpal tunnel syndrome and psychological treatment. We remand for further consideration of petitioner's claim for the foregoing medical benefits, but affirm the CRB's ruling insofar as it upheld the termination of TTD benefits.

**I.**

On April 28, 2010, petitioner was working as a pile driver for intervenor Clark Construction Group (the "Employer") when he was thrown backward in a boat, injuring his head, neck, and back. Petitioner sought medical treatment and thereafter filed a claim for workers' compensation benefits. On May 26, 2011, a hearing was held on his claim. Petitioner's evidence at the hearing included reports from his treating physicians. The Employer submitted reports by independent medical examiner ("IME") Dr. Louis London, a neurologist, and IME Dr. Gary Levitt, an orthopedist. Dr. London opined that petitioner's injuries had "resolved without residual," that petitioner had "no continuing injury causally related to anything that occurred on [April 28, 2010]," and that he "require[d] no further medical care" and could "return to his normal and usual employment as a [p]ile [d]river without restriction." Similarly, Dr. Levitt opined that petitioner had "reached maximum medical improvement" and had "the ability to return to work immediately" without limitation or modification of his work activity.

In a June 24, 2011, Compensation Order (the "Initial CO"), which was upheld on appeal to the CRB, DOES ALJ Heather Leslie awarded petitioner TTD benefits, finding that petitioner's "back and lower extremity complaints [had] resolved" but that his "neck, left shoulder, left upper extremity and head condition [were] causally related to the injury of April 28, 2010" and continued to render him

disabled. After the Initial CO was issued, the Employer caused additional examinations to be performed by IMEs London and Levitt. After re-examining petitioner on December 5, 2011, and June 25, 2012, and reviewing new records from petitioner's treating physicians, Dr. London again found that petitioner had "no condition related to anything that occurred on [April 28, 2010]," had "reached maximum medical improvement long ago," and could return to his normal employment without restriction. Dr. Levitt examined petitioner again on November 1, 2011, and May 29, 2012. On the basis of those examinations, he stated that it was "beyond [his] comprehension . . . as to why [petitioner] still require[d] care," that petitioner's treatment by his treating physicians had been "driven purely on the basis of subjective complaints by the [petitioner] and a willingness for his doctors to treat him without clear evidence of any objective measure of pathology" or "structural injury," and that petitioner could return to work immediately without modification of work activity.

After receiving the additional IME reports, the Employer filed an application for a hearing, seeking to modify the Initial CO. On January 18, 2013, DOES ALJ Karen Calmeise held an evidentiary hearing. On December 13, 2013, ALJ Calmeise issued the MO, terminating petitioner's TTD benefits and medical benefits upon finding that petitioner had reached maximum medical improvement

and that the injuries to his head, neck, and back had resolved. In an August 14, 2014, Decision and Order, the CRB upheld the MO.

This petition for review followed. Petitioner argues that the Employer made no affirmative factual showing of a change in his condition and thus there was no basis for a modification hearing to be held. Petitioner also argues that the Employer failed to prove that his condition had changed so as to warrant a modification of benefits, because the Employer's medical evidence — new reports by IMEs Levitt and London — were "nearly identical" to their opinions that were rejected by ALJ Leslie in the Initial CO. Petitioner further contends that ALJ Calmeise "improperly applied the burden of proof" to him, by "effectively requiring him to prove that his condition had not changed." Finally, petitioner argues that both the ALJ and the CRB failed to apply the presumption of compensability in addressing his claims for medical benefits.

**II.**

Under D.C. Code § 32-1524 (2012 Repl.), a provision of the District of Columbia Worker's Compensation Act (the "Act"), upon application by a party, DOES may "order a review of a compensation case . . . where there is reason to believe that a change of conditions has occurred which raises issues concerning: (1) [t]he fact or the degree of disability or the amount of compensation payable pursuant thereto[.]" D.C. Code § 32-1524 (a). A party may apply for a § 32-1524 review "*[a]t any time* prior to 1 year after the date of the last payment of compensation or at any time prior to 1 year after the rejection of a claim[.]" *Id.* (emphasis added).[1] The review "shall be limited solely to new evidence which directly addresses the alleged change of conditions." D.C. Code § 32-1524 (b).

This court has approved DOES's interpretation that when an applicant requests a § 32-1524 review, the agency must conduct a "preliminary examination of evidence intended to be submitted at an evidentiary hearing" and then — if that examination reveals "evidence which could establish, if credited, changed conditions" (the "threshold test") — conduct an evidentiary hearing on the issue of

---

[1] Petitioner decries the possibility that a party dissatisfied with a compensation award may "file repeated applications for modification[.]" But that is precisely what the statutory "at any time" language permits. However, as we discuss *infra*, our case law establishes that such a dissatisfied party will have to make a threshold showing of a change in condition(s) before being allowed to progress to an evidentiary hearing on its application for modification.

whether there has been a change in conditions. *Snipes v. District of Columbia Dep't of Emp't Servs.*, 542 A.2d 832, 834 n.4, 835 (D.C. 1988); *see also Washington Metro. Area Transit Auth. v. District of Columbia Dep't of Emp't Servs.* ("*WMATA*"), 703 A.2d 1225, 1228-29 (D.C. 1997) (describing the "two-step procedure": "(1) a determination that there is reason to believe that a change in the claimant's condition has occurred," which "requires an affirmative factual showing that a change of conditions has occurred," and "(2) an evidentiary hearing if that test is met"); *id.* at 1230 (describing the "modest threshold burden of producing minimal evidence"— "something short of full proof" — to support the 'reason to believe standard'"). We have said that it is error for DOES to "fail[] to make the requisite threshold determination," a circumstance that entitles the non-moving party to prevail. *Id.* at 1226, 1231.

In cases involving modification orders, "[o]ur scope of review . . . requires us to decide whether the agency made the threshold determination under the statute and whether its determination is supported by substantial evidence in the record." *Id.* at 1228. More generally, this court will affirm a ruling of the CRB unless the ruling is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Georgetown Univ. v. District of Columbia Dep't of Emp't Servs.*, 971 A.2d 909, 915 (D.C. 2009) (internal quotation marks omitted). Our

review of the CRB's legal rulings is *de novo*. *Fluellyn v. District of Columbia Dep't of Emp't Servs.*, 54 A.3d 1156, 1160 (D.C. 2012) (internal quotation marks omitted). "Although our review in a workers' compensation case is of the decision of the CRB, not that of the ALJ, we cannot ignore the compensation order which is the subject of the CRB's review." *Reyes v. District of Columbia Dep't of Emp't Servs.*, 48 A.3d 159, 164 (D.C. 2012) (internal quotation marks and alterations omitted).

## III.

Petitioner argues that the Employer failed to make the required threshold showing of a reason to believe a change had occurred in his condition, that the Employer thus was not entitled to a hearing ("[N]o evidentiary hearing on modification should have taken place[.]"), and that the CRB erred in failing to so recognize. For the reasons that follow, we disagree.

To begin with, the relevant test is whether there was "a change of conditions," D.C. Code § 32-1524 (a), not necessarily a change in petitioner's

medical condition. An employer can make a threshold showing of a reason to believe there has been a change in conditions by proffering evidence of a change in "non-medical circumstances," such as a "change in . . . wage-earning capacity." *WMATA*, 703 A.2d at 1229; *In re Fiumara*, AHD No. 09-467B, OWC No. 587392, 2015 WL 609772, at *3 (D.C. Dep't Emp't Servs. Jan. 15, 2015) (recognizing that an employer may seek a modification of a claimant's award based on the claimant's failure to cooperate with vocational rehabilitation). Here, in its hearing request made on September 25, 2012, the Employer asserted, *inter alia*, that petitioner had "fail[ed] to cooperate with vocational rehabilitation" and had voluntarily limited his income. The record shows that, at that time, the Employer had reports from petitioner's vocational rehabilitation case manager that petitioner was not motivated to return to work and had made a "poor appearance and presentation" (such as by not being appropriately dressed) at job interviews. The Employer also had deposition testimony from petitioner confirming that he had told one potential employer that he was willing to work only one Saturday a month because there are "times I need to talk to my kids on the phone and spend time with my kids." We have no trouble concluding that these reports were sufficient to enable DOES to determine that the Employer had satisfied the "modest threshold burden of producing minimal evidence" of a change in condition described in *WMATA*. 703 A.2d at 1230.

In response to the Employer's hearing request, the ALJ sought to schedule a "*Snipes* hearing" for January 8, 9, or 10, 2013, and the parties agreed to attend a *Snipes* hearing on January 8, 2013. Although the ALJ might have considered the vocational rehabilitation and deposition evidence described above in a (limited) *Snipes* hearing, it appears that the contemplated hearing turned into a full-blown evidentiary hearing, which did not begin until January 18, 2013, at which the ALJ had before her failure-to-cooperate evidence as well as other evidence (including medical reports and opinions). The record does not firmly establish that DOES conducted a preliminary review of the type described in *Snipes*.[2] However, the record does indicate that the ALJ and the parties had at least one pre-hearing conference call prior to the January 18 evidentiary hearing and that, prior to the evidentiary hearing, the ALJ looked at some of the Employer's vocational rehabilitation evidence (including evidence that the Employer's counsel characterized as showing that petitioner had "sabotag[ed] job interviews"). On this record, and in light of our conclusion above that the evidence the Employer had in hand (at the time it requested a hearing) met the *Snipes* threshold burden, we

---

[2] Petitioner asserts that "a *Snipes* hearing was never held in this matter and that the matter proceeded directly to an evidentiary hearing."

cannot conclude that petitioner is entitled to relief for the ALJ's alleged failure to make the requisite threshold determination required under *Snipes*.

We also note that while petitioner complains now that the matter should not have progressed to an evidentiary hearing on the Employer's request to modify the award of TTD benefits, the record reveals no objections by petitioner to the scope of the January 18 hearing. Petitioner signed the Joint Pre-Hearing Statement in which he identified, as among his "[c]ontested issues," "[c]ontinuing temporary total disability benefits" and "change of vocational counselor," and in which the Employer identified "modification of the June 24, 2011 Compensation Order due to a change of condition" as a contested issue. Petitioner also registered no objections when, at the outset of the January 18 hearing, ALJ Calmeise identified the issues as including the Employer's "ultimate request for modification of the June 24, 20[11] compensation order," when the Employer's counsel confirmed that the Employer sought a termination of TTD benefits, or when the Employer's counsel said the same in her opening statement. Petitioner also did not object to any of the Employer's exhibits, which included updated reports from the IMEs. We conclude that petitioner had "ample opportunity to clarify [or protest] the nature of the . . . hearing if []he had any doubts [or concerns] about its scope,"

*Snipes*, 542 A.2d at 835, and that his complaint now about the lack of a preliminary review or threshold showing comes too late.

**IV.**

In challenging the CRB's affirmance of the MO, petitioner focuses in part on the ALJ's reliance on the "duplicative" new reports of the IMEs, reports that he asserts are "substantively identical to the first round of IME reports submitted."[3] It is true that the reports from Drs. Levitt and London that the Employer submitted in connection with the hearing before ALJ Calmeise reach the same conclusions the two IMEs had reached in their reports submitted during the hearing before ALJ Leslie: maximum medical improvement, no unresolved injuries, and petitioner's fitness to return to his pre-injury work. However, the CRB reasonably determined that the IMEs' reports, based on their new examinations of petitioner — in

---

[3] For example, as petitioner emphasizes, Dr. London stated in his report based on his December 2, 2011, examination of petitioner that, "[i]n comparing today's examination to my examination of 5/2/11, there has been no change." Dr. London's June 25, 2012, report likewise acknowledges "no change in my impressions."

November 2011 (Dr. Levitt), December 2011 (Dr. London), May 2012 (Dr. Levitt), and June 2012 (Dr. London) — constituted new evidence. As the CRB put it, "[i]t is not the conclusion alone that is dispositive of whether or not the evidence qualifies as 'new'; it is the foundation of that conclusion that is determinative of whether or not the evidence qualifies as 'new.'" Having examined petitioner again and having reviewed petitioner's treating physicians' reports from dates after the Initial CO, both IMEs had new foundations for their opinions on which ALJ Calmeise relied.[4]

Moreover, when the issue is whether there has been a change in a claimant's medical condition, the relevant change is a change in the condition determined to exist by the previous factfinder (here, ALJ Leslie), not a change from an IME's previous estimation of the claimant's condition. *See WMATA*, 703 A.2d at 1228 ("The examiner [at the modification hearing] started appropriately with *the determination made in the prior order* that Anderson's condition was

---

[4] We noted in *Snipes* that "the hearing examiner rejected the medical reports on the ground[s] [that] they merely reasserted medical conclusions rejected in the prior hearing." *See* 542 A.2d at 835. However, the opinion in *Snipes* does not indicate whether (as is the case here) the medical reports in issue were based on new examinations or information. *Snipes* does not stand for the proposition that a change of condition cannot be demonstrated if doctors maintain the medical opinions they expressed in connection with a prior proceeding.

permanent[.]") (emphasis added); *cf. Lewis v. Workers' Comp. Appeal Bd.*, 919 A.2d 922, 926 (Pa. 2007) ("[T]he employer must demonstrate a change in physical condition since the last disability determination."); *National Zinc Co. v. Dewitt*, 574 P.2d 300, 303 (Okla. 1978) (holding that a physician's evaluation of claimant's disability submitted in a proceeding to modify an award upon a change of condition "is not limited in its effect to the . . . difference [between that evaluation] and [the] physician's evaluation submitted in a prior proceeding").

We also agree with the observation by another court in a workers' compensation case that the fact that a doctor's previous testimony (at the hearing that preceded a previous compensation order) did not carry the day does not preclude the finder of fact at a change-of-conditions hearing from "accepting and believing the testimony of the doctor . . . tending to establish a change in condition." *United States Gypsum Co. v. Pendleton*, 340 P.2d 467, 468 (Okla. 1959). While petitioner is correct that ALJ Leslie "rejected [the IMEs' initial reports] explicitly," she did so for very specific reasons that do not apply here.[5]

---

[5] Nor is this a case in which the ALJ at the initial hearing "seriously questioned [the] impartiality" of the IMEs, such that ALJ Calmeise should have exercised special "caution . . . in determining whether the [IMEs'] recommendation should be followed over those of the current treating physician[s]." *Changkit v. District of Columbia Dep't of Emp't Servs.*, 994 A.2d 380, 390 (D.C. 2010).

ALJ Leslie explained that Dr. Levitt "only examined the Claimant one time," gave his opinion without reviewing the MRI he had recommended, and was "not in possession of all the objective testing the Claimant underwent." As to Dr. London, ALJ Leslie explained that the doctor offered no explanation for the headaches that petitioner testified "credibly" he continued to suffer. Petitioner does not claim that either IME failed to consider all of his updated objective testing. And, regarding petitioner's testimony at the January 18 hearing about his "constant" headaches, ALJ Calmeise found that petitioner was "not credible." Thus, she discerned no need for the IMEs to explain petitioner's headaches.

## V.

We next address whether the CRB erred in ruling that the ALJ's finding that petitioner is no longer totally disabled is supported by substantial evidence. Our task is "to determine whether [petitioner] has demonstrated that the [ALJ's] finding" — that there was a "change [of condition] that warrants modification of the standing compensation order" — is unsupported by substantial evidence in the

record of the proceedings." *Snipes*, 542 A.2d at 835 (internal quotation marks omitted).[6]

The backdrop for understanding what change of condition ALJ Calmeise found is the Initial CO,[7] in which ALJ Leslie found that the "most notabl[e]" aspect of petitioner's medical condition as of the May 2011 hearing was the headaches about which he "credibly testified." ALJ Calmeise cited a number of factors that supported her determination that petitioner no longer suffers from disabling head or neck pain. She noted the "updated medical opinions" of IMEs

---

[6] Petitioner argues that the ALJ and the CRB "improperly imposed [on petitioner] the burden to disprove a change in conditions[.]" He cites ALJ Calmeise's statement that petitioner "has not sustained his burden of proving . . . that he continues to be disabled[.]" What petitioner fails to mention is that the ALJ turned to whether petitioner had met his burden of proof only after concluding that the Employer had "met its burden of proof under the Act, to establish a sufficient basis to terminate Claimant's TTD benefits and to deny his request for continued medical treatment." ALJ Calmiese explained that upon her "[h]aving determined Employer is justified in its decision to halt Claimant's compensation benefits and terminate all ongoing medical treatment[,] Claimant must now adduce sufficient probative evidence to support his claim for continuing TTD benefits, including payment of medical expenses." Although, as a general rule, "the burden of showing a change of conditions has . . . been held to be on the party claiming the change, whether a claimant or employer[,]" *WMATA*, 703 A.2d at 1231, "[t]he burden may shift once the moving party establishes his case." *Id.*

[7] *See Snipes*, 542 A.2d at 835 (reasoning that "a hearing examiner must necessarily take into account what came before in determining whether a 'change' has occurred").

Levitt and London — which were based on their examinations of petitioner conducted after the hearing that led to the Initial CO, and on their review of petitioner's most recent medical treatment records — that petitioner has reached maximum medical improvement and has the capacity to return to work. She further noted that despite petitioner's January 18, 2013, testimony that he "still constantly" has neck pain and headaches that "don't stop," his treating orthopedists had "prescribed no medical treatment for the head and neck complaints"[8] and his treating neurologist imposed no physical work restrictions because of his complaints of headaches. The ALJ also observed that the treating physicians' reports "do not reflect" any "noted observation" that petitioner "appeared distressed or in [head] pain" during "any of the twenty one (21) medical examination visits" in 2011 and 2012, and that petitioner's testimony about pain from the head and neck injury was "inconsistent with the medical records"[9] and unsupported by objective findings.

---

[8]  ALJ Calmeise acknowledged that petitioner's treating orthopedists and neurologist did recommend pain management and nerve testing, respectively, for petitioner's carpal-tunnel-related complaints about his left-arm pain or pain radiating from the neck down into the left arm and hand, but found that petitioner's left-arm complaints "are not related to the 2010 work related injury" (a conclusion that we discuss in section VI *infra*).

[9]  We note that petitioner's cervical MRI from August 2010 showed "evidence of soft tissue injury" to his neck, while no mention of such is made in the report of his February 2013 MRI.

ALJ Calmeise noted in addition that petitioner "did not appear to be in discomfort" during the two-hour January 18, 2013, hearing. Further, ALJ Calmeise found "[a]s an initial matter" that petitioner was "not credible"[10] and that his demeanor at the January 18 hearing was "deliberately evasive and contradictory." Although the Employer initially sought the modification hearing on the basis of petitioner's alleged failure to cooperate with vocational rehabilitation and voluntary limitation of income, and although the Employer presented testimony from petitioner's vocational rehabilitation case manager in support of those allegations, ALJ Calmeise ultimately found it unnecessary to resolve those issues (stating that they were "moot"). However, it is clear that her observations about petitioner's evasiveness and contradictory testimony focused on his testimony related to the vocational rehabilitation/job search process (which, in fact, was the subject of most of his testimony). In explaining those observations, the ALJ referred to the inconsistency between petitioner's testimony about having friends who, before the workplace accident, helped him compensate for his lack of reading and writing skills, and his testimony that, after the accident, he "did not

---

[10] We agree with the CRB that the fact "[t]hat a different ALJ presiding over a different formal hearing on different issues under different circumstances found Mr. Bowser credible does not prevent other ALJs from reaching a different conclusion based upon Mr. Bowser's demeanor, Mr. Bowser's conduct at a formal hearing, and the evidence presented at that proceeding."

have anyone to help him follow up on job leads while working with the vocational rehabilitation specialist." ALJ Calmeise also noted the contradiction between petitioner's testimony that he "underwent [a] 40 hour welding certification" training process and his claim to his treating neurologist that he "was unsure he could perform a light duty flagging job" offered by the Employer.[11] The ALJ did not give examples of petitioner's evasive testimony, but our review of the hearing transcript reveals that petitioner repeatedly gave evasive answers that he did not "remember" or did not "understand the question" when pressed about whether he had told the vocational rehabilitation case manager that he could not take a job outside the pile drivers union because he would lose his union benefits, whether he asked the case manager to help him arrange for reading classes, and whether he needed the case manager to accompany him to job interviews.[12]

---

[11] The vocational rehabilitation case manager testified that petitioner requested that the case manager help him find forklift and welding jobs.

[12] In other instances, petitioner was not evasive, but gave straightforward answers that betrayed what the vocational rehabilitation case manager characterized as petitioner's "just going through the motions" of a job search. Petitioner told ALJ Calmeise that although he was offered a job at McDonald's (that could accommodate his illiteracy), he told the prospective employer that he "didn't like working nights and weekends" and that he believed that working "[a]nything other than" "40 hours a week Monday through Friday" was "optional." Petitioner also agreed on cross-examination by the Employer's counsel that "one of [his] issues" is that he "would like to go back to a job that is a union job." The vocational rehabilitation case manager testified that petitioner simply "wasn't

(continued…)

In short, the ALJ appears to have inferred from petitioner's hearing demeanor, and from his inconsistent statements and evasiveness when questioned about the job search, that his condition had changed since the date of the Initial CO.[13]   The ALJ was entitled to draw that inference, because a claimant's exaggeration of his physical symptoms or false statements about his reasons for not pursuing work opportunities can support an inference "that the claimant's disability or ability to work has changed." *Simmons v. Workers' Comp. Appeal Bd.*, 96 A.3d 1143, 1149 (Pa. Commw. Ct. 2014) (explaining that "a diagnosis of malingering can be a sufficient change in condition as a matter of law to support a modification of benefits").[14]

---

(…continued)
prepared to market himself properly for any kind of employment," in presentation, demeanor, and attitude.

[13]   Moreover, the ALJ stated during the hearing that the fact that petitioner was (at least in some fashion) "going along with the [vocational rehabilitation] process" arranged by the Employer meant that he was "capable of working in some capacity."   By contrast, when ALJ Leslie awarded petitioner TTD benefits notwithstanding the fact that petitioner's physicians had "released [him] to light duty," she did so because the Employer had not shown the availability of work he could do.

[14]   Although ALJ Calmeise found that petitioner's complaints of continuing pain were not credible, she did not explicitly suggest that petitioner was "malingering" — i.e., "intentional[ly] produc[ing] . . . false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as . . .

(continued…)

In light of all the foregoing, we conclude that substantial evidence supports the CRB's ruling that the ALJ had a sufficient basis for concluding that a change of condition had occurred: i.e., that petitioner is no longer totally disabled and no longer entitled to TTD benefits. We therefore affirm the CRB's ruling upholding the ALJ's determination to that effect.

**VI.**

---

(…continued)

avoiding work [or] obtaining financial compensation[.]" *Simmons*, 96 A.3d at 1146 n.3 (internal quotation marks omitted). Nor did she attribute to either IME an opinion that petitioner was malingering. However, both IMEs made comments in their reports that can be read to suggest that they suspected or saw indications of malingering. For example, in his May 29, 2012, report, Dr. Levitt wrote that petitioner "ma[d]e a poor effort at all motors to the left upper extremity" during the examination, but had no "disuse atrophy" in the upper arms or forearms. Dr. London reported after his June 25, 2012, examination of petitioner that petitioner "change[d] his history today," reporting a "continuing" lumbar problem though having told the doctor in 2011 earlier that his lumbar problem had resolved. Dr. London also observed that petitioner "resists range of motion in all directions, and indeed there is almost no neck movement today."

Petitioner's final argument relates to the ALJ's rejection of his claim for payment of medical expenses related to his diagnosed carpal tunnel syndrome and his psychological or psychiatric treatment.[15] Petitioner argues that the ALJ erred by failing to apply the presumption of compensability (i.e., the presumption that there is medical causal relationship between an injury and a work-related event that had the potential to cause that injury). *See Short v. DOES*, 723 A.2d 845, 851-52 (D.C. 1998) (noting that any doubts as to causation "are to be resolved in favor of the claimant"). He also argues that the issue of medical causation as to his carpal tunnel syndrome was not properly before the ALJ and that she therefore had no authority to decide the issue.[16]

---

[15] The ALJ found that petitioner's "left arm complaints are not related to the 2010 work related injury." She also noted the finding by IME Dr. Brain Shulman that petitioner had "reached maximum medical improvement as related to any neuropsychiatric complaints and that further psychiatric treatment is not necessary." For its part, the CRB declined to "reweigh the evidence" and stated that medical necessity was not an issue because neither party had submitted a utilization review report.

[16] The discussion above (upholding the ALJ's conclusion that the injuries to petitioner's head, neck, and back have resolved and are no longer disabling) does not resolve the medical-benefit issues as to treatment for carpal tunnel syndrome and petitioner's claimed psychological injury, because "in principle a claimant might be able to return to work and yet have continuing medical expenses[.]" *Snipes*, 542 A.2d at 836.

The Employer concedes that the ALJ and the CRB failed to address the causal relationship between petitioner's claimed psychological injury and the workplace injury and agrees that a remand is required on this issue. For that reason, insofar as the CRB declined to overturn the ALJ's ruling with respect to petitioner's claim for "ongoing psychiatric care," we reverse and remand.

The Joint Pre-Hearing Statement includes petitioner's statement that he "seeks medical benefits in the form of . . . medical treatment recommended by Dr. Matthew Ammerman" (which the ALJ found to consist of repeat MRI and EMG diagnostic tests to address petitioner's carpal tunnel condition) and also identified as an issue "payment of related medical expenses." In addition, the parties agreed at the outset of the January 28, 2013, hearing that those were issues to be resolved. Given those facts, we are not persuaded that the issue of medical benefits for carpal tunnel syndrome was not before ALJ Calmeise or that she exceeded her authority in resolving that issue.

Although ALJ Leslie referred in the Initial CO to the evidence about petitioner's carpal tunnel syndrome (referring to a test showing "'a mild bilateral median neuropathy noted at the wrist. (Carpal Tunnel Syndrome.)'"), she made no finding about any causal relationship between the carpal tunnel condition and the

workplace injury, and thus she had no occasion to apply the presumption of compensability. For that reason, and contrary to the CRB's analysis, the evidence of a change in the disabling conditions found in the Initial CO did not obviate the need for application of the presumption of compensability with respect to the claim for medical benefits for carpal tunnel syndrome. ALJ Calmeise correctly observed that petitioner's treating neurologist, Dr. Vandana Sharma, did not "connect . . . [petitioner's] carpal tunnel condition to the . . . April 2010 boat incident" or characterize the carpal tunnel condition as trauma-related. The ALJ also had before her a report in which IME Dr. London opined that petitioner's carpal tunnel syndrome "is totally unrelated to anything that occurred on 4/28/10," as well as a report from IME Dr. Levitt that there were no objective findings "consistent with a discreet neuropathic process peripherally, i.e., carpal tunnel syndrome." But there is evidence in the record — a 2010 opinion by consulting neurosurgeon Dr. Ammerman that petitioner's left arm pain is "directly related to his accident" and an opinion by treating orthopedic surgeon Dr. Neil Green that petitioner's symptomology "may be related to some double crush phenomenon" —that links petitioner's carpal tunnel condition to the workplace accident and neck injury.[17] In

---

[17] It appears that ALJ Calmeise erroneously cited Dr. Ammerman's June 21, 2012, report (Claimant's Exhibit 6, p. 3) as supporting a conclusion that petitioner's "left arm complaints are not related to the 2010 work injury." Perhaps the ALJ did so because Dr. Ammerman's report misquotes Dr. Sharma's June 24,

(continued…)

light of that evidence, we conclude that the ALJ's failure to do an analysis that "provide[d] petitioner with the benefit of the statutory presumption of compensability," *Ferreira v. DOES*, 531 A.2d 651, 655 (D.C. 1987), was contrary to law. Accordingly, we must reverse and remand the CRB's decision insofar as it upheld the ALJ's ruling on this issue.[18]

## VII.

For the foregoing reasons, we reverse the portion of the CRB's Decision and Order relating to petitioner's claim for medical benefits for treatment of his carpal tunnel and psychological conditions, and remand for further proceedings consistent

---

(…continued)

2010, report as saying that petitioner's nerve test showed a "bilateral median neuropathy *at risk*" (italics added), when in fact the 2010 report referred to a "bilateral median neuropathy noted *at the wrist*" (italics added).

[18] We note that at the January 18, 2013, hearing, the Employer's counsel told the ALJ that the Employer had agreed to pay for the MRI recommended by Dr. Ammerman, and petitioner's counsel agreed that this left "on the table" the issues of the EMG test and "pain management referral." We leave it to the CRB and the ALJ to sort out what remains of these issues.

with this opinion. We affirm the CRB's decision upholding the ALJ's determination to terminate petitioner's temporary total disability benefits.


*So ordered.*